## Fertig v. Fertig.

(Decided June 15, 1917.)

### Appeal from Jefferson Circuit Court (Chancery Branch, First Division).

Appeal and Error—Equitable Action—Question of Fact—Conflicting Evidence.—Where, in an equitable action, involving the question of partnership, the evidence is conflicting, and, upon a consideration of the whole case, the mind is left in such doubt that the court on appeal cannot determine with reasonable certainty that the chancellor erred, his finding that no partnership existed will not be disturbed.

BLAKEY, QUIN & LEWIS for appellant.

O'NEAL & O'NEAL and HENRY J. TILFORD for appellee.

OPINION OF THE COURT BY WILLIAM ROGERS CLAY, COMMISSIONER—Affirming.

George E. Fertig brought suit against his brother, Charles E. Fertig, to recover three lots standing in the name of Charles and to settle Charles' accounts as George's agent. About the same time Charles brought a separate suit against George for a dissolution and settlement of an alleged partnership. The two suits were consolidated, and on final hearing the chancellor adjudged that no partnership ever existed between the parties. He further adjudged that George Fertig was the sole owner of the three lots in question and entitled to have them conveyed to him free of any claim on the part of Charles. He then referred the case to the master commissioner for the purpose of determining the amount of money in Charles' hands due to George after a reasonable compensation for George's services as agent. From this judgment Charles appeals.

Briefly stated, the facts are as follows: George and Charles Fertig are twin brothers and were born on March 4, 1870, in that portion of Louisville known as "Shippingport." They were the youngest of a family of nine chil-

dren, eight of whom are still living. After their father's death, which occurred in 1875, they lived with their widowed mother on the home place until they were about twenty-eight years of age. After going to school for a while, they obtained employment at Pilcher's organ factory, where they worked side by side for about ten years making organs. At first they received $4.00 per week, but their wages were gradually increased until they received about $13.50 per week. In the year 1895, Charles quit working for the organ factory and began to build cars for the Louisville Railway Company. For a while he attended the Y. M. C. A. night school and took a course in mechanical and electrical engineering. Later on, he got a position as electrical and mechanical engineer at the custom house, where he remained until 1902. During this period he received a salary of $60.00 a month and extra compensation for outside work, which he was able to perform because his duties did not take all of his time. He married in 1899 and has two children, the elder being named for his brother George. In 1903, he secured employment as electrical and mechanical engineer at the Masonic Temple at a salary of $100.00 a month, with extra pay for Sundays. This position he still holds. His duties there did not require him to be present earlier than four o'clock in the afternoon.

George quit working at the organ factory in 1897, and early in 1898 went to Detroit, where he spent a year working for the Austin Organ Company. In December, 1898, the factory at which George worked in Detroit was destroyed by fire, and he returned to Louisville. After being out of employment for a few months, he went to Boston, where his former employers had rebuilt their factory. After continuing in this employment for a number of years at a substantial salary, he returned to Louisville in the year 1912, where he took up the business of erecting houses on vacant lots in connection with his brother Charles.

Prior to 1899, Charles and George had each saved enough money out of their earnings to buy a lot and erect a house thereon, at a cost of $3,000.00 to Charles, and of $2,000.00 to George. George's house and lot were located on Montgomery street, and rented at from $16.00 to $18.00 per month. Before going to Detroit, George arranged with Charles to collect the rents on his property and turn them over to his mother as a contribution to her support. By the spring of 1899 George had accumulated

from his earnings and rents, which his mother had not used for her support, the sum of $500.00. About this time arrangements were made to purchase the Fehr property at the price of $800.00. Before the transaction was closed George returned to Boston. To carry out the trade for the Fehr property George borrowed $300.00 from his brother Joe. Thereafter George's rent account was permitted to accumulate, and he also sent to Charles such portions of his earnings as he could spare. With these accumulations the Drake property, on High street between Twenty-sixth and Twenty-seventh streets, was purchased by Charles and conveyed to George. In September, 1902, Mrs. Fertig died, and it was agreed between the children that George should buy the home place for $600.00. The deed to this property was drawn by Charles and signed by him and the other heirs. At this time Will Fertig, one of the brothers, was absent, and Charles, in informing him of the sale of the home place, referred to the fact that he was managing George's affairs. Besides the home place, the Fehr lot and the Drake lot, Charles purchased, during the next few years, the Kennedy lots, the Groves lots and the Boone lots. With the exception of the Boone lots, the title to all of these tracts was taken in the name of George. After George's return to Louisville two other lots were purchased and the title taken in his name. On these various lots there are now about thirty cottages, with an annual rental of $3,800.00. Of these houses twenty-four were built by Charles without any assistance from George. The various lots were purchased with the remittances made by George to Charles, which amounted to $6,000.00, and with the rents that Charles collected.

Charles testifies that just prior to George's return to Boston he and George formed a partnership for the purpose of buying lots, building houses thereon, etc. To carry out this arrangement he was to use the rents from George's property and whatever money George should send for that purpose, and was to devote his spare time to the purchase of lots and the construction of houses thereon. In other words, he was to give his spare time, while George was to give his spare money. After this agreement, he studied the real estate situation, attended commissioners' sales and secured numerous bargains in the purchase of real estate. He not only collected all the rents, but superintended, and actually assisted in, the construction of the various houses which he erected. In paying for the lots and building the houses he used the

accumulated rents and about $6,000.00 which George sent him from time to time. He further exhibited two letters from George, which spoke of him and George as "we" and referred to the property as "our" property. He also introduced four or five witnesses, who claim that, after George's return to Louisville, he either referred to Charles as his partner or spoke of the property in such a way as to lead them to believe that a partnership existed. Charles does not attempt to explain why the title to the various lots was taken first in George's name, then in his name and then in George's name, except to say that the deeds were taken in that way because each trusted the other.

On the other hand, George denies that any partnership agreement was ever made between them, or that the question of partnership was ever mentioned until Charles suggested the printing of letter heads showing a partnership, to which he objected. He further states that he at first asked Charles if he was taking pay for his services, but Charles always said that he was not entitled to anything for his services, as George could get a trust company to attend to the matter for a commission of two or two and a half per cent. The other brothers also say that, while they never heard Charles say he did not claim any interest in the property, they frequently heard him refer to the property as George's, and to the fact that he was merely doing the work to help George.

It is insisted on behalf of Charles that all the facts and circumstances connected with the property in question tend to support his testimony to the effect that there was a partnership. In this connection great stress is placed on the fact that Charles, in purchasing the various lots, obtained bargains which he naturally would have taken advantage of himself if it had not been for the partnership; that he built the twenty-four houses largely with his own labor and at a great saving over the ordinary cost; that he never claimed or received any pay for his services; that he managed the property in all respects as if he were a joint owner; that the estate is now worth from $45,000.00 to $49,000.00, and at least four-fifths of this value was created by Charles. While it might be true that these facts would be very persuasive of partnership if Charles and George were mere strangers, yet, they lose much of their force when considered in the light of their intimate relationship and the circumstances under which Charles first began to look after the property. Not

only were they twin brothers, but, for a number of years, they worked side by side and their relations were most cordial and intimate. If a partnership had been intended in the home property, we are unable to perceive why Charles should have united in the deed to George alone and should have received his part of the purchase money, and that in writing to his brother about this transaction he should have referred to the fact that he was managing George's affairs. Furthermore, if a partnership had existed, the natural thing to do would have been to take title in the name of both. Instead of doing this, the title to all of the lots, with the exception of the Boone lots, was taken in the name of George. During all of this time his brothers say that Charles referred to the property as George's, and spoke of doing the work in order to help George. Thus it will be seen that, while, on the one hand, there are certain facts tending to show a partnership, there are, on the other hand, other facts equally potent and controlling that are absolutely inconsistent with the existence of a partnership. Under these circumstances, the case falls within the rule that, where the evidence is conflicting, and, upon a consideration of the whole record, the mind is left in such doubt that the court cannot say with reasonable certainty that the chancellor erred, his finding will not be disturbed. Weddington v. Weddington, 169 Ky. 339, 183 S. W. 897; Rawlings v. Fish, 151 Ky. 764, 152 S. W. 941.

Judgment affirmed.

Whole court sitting.